

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MAURICE NELSON,         )
         )
    Plaintiff,     )
         )    No. 05 C 3670
vs.         )
         )    Magistrate Judge Schenkier
JOHN E. POTTER, Postmaster General   )
of the United States Postal Service,   )
         )
    Defendant.    )

## MEMORANDUM OPINION AND ORDER

In August 2002, plaintiff, Maurice Nelson, was terminated from his employment with the United States Postal Service. In his three-count amended complaint, Mr. Nelson asserts that his termination: (1) violated the Americans with Disability Act ("ADA"), 42 U.S.C. § 12102, *et. seq.*, and the Rehabilitation Act, 29 U.S.C. § 794(a) (Count I); (2) constituted race discrimination in violation of Title VII, 28 U.S.C. § 701, *et. seq.* (Count II); and (3) was in retaliation for his contacting the Equal Employment Office ("EEO") in violation of Title VII (Count III). Defendant has moved for summary judgment on all claims in the amended complaint (doc. # 66). For the reasons that follow, the Court grants defendant's motion for summary judgment.[1]

### I.

Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue for trial exists

---

[1] By the parties' consent and pursuant to 28 U.S.C. § 636(c)(1) and Northern District of Illinois Local Rule 73.1(b), on November 15, 2005, the case was reassigned to the Court for all proceedings, including the entry of final judgment (doc. # 34).

when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the non-moving party, and must draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990).

To successfully oppose a motion for summary judgment, a party must identify facts that are both material and genuinely disputed. *Celotex*, 477 U.S. at 324. To be material, a fact must be able to affect the outcome under the substance of law governing the motion. *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex*, 477 U.S. at 323, the non-moving party cannot rely on the pleadings alone, but must offer evidence to identify material facts which created a genuine issue for trial. *Id.* at 324; *Insolia*, 216 F.3d at 598. If the evidence offered in opposition to summary judgment is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. As the Seventh Circuit has warned, "[a] party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'" *Ciasse Nationale De Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (citations omitted); *see also Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001) (explaining that summary judgment "is the 'put up or shut up' moment in a lawsuit" (citations omitted)).

In his opposition to defendant's summary judgment motion, Mr. Nelson "put up" virtually nothing of an evidentiary nature. Local Rule 56.1 sets forth very clear substantive and procedural requirements for a party opposing a summary judgment motion. Plaintiff disregarded all of them.

2

Plaintiff did not follow the procedural format for a response to movant's fact statement; he rarely cited to evidence when he sought to dispute or qualify a fact statement; and he gave ambiguous or argumentative responses instead of direct answers to certain of defendant's fact statements. Moreover, Mr. Nelson offered no statement of additional facts in opposition to summary judgment, as he was entitled to do.

A party opposing summary judgment who fails to offer evidence to rebut a statement of undisputed material fact that is set forth by the movant does so at his peril: "[a]ll material facts set forth in a statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(c), Local Rules of the United States District Court for the Northern District of Illinois. Our appeals court has repeatedly upheld the application of these rules as appropriate and necessary tools of case management. *Koszola v. Board of Education of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) ("we have emphasized the importance of local rules and have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment") (citations omitted).

In any event, Local Rule 56.1 only reiterates what already is made clear in Federal Rule of Civil Procedure 56: that the "statement" of the party opposing summary judgment must be an evidentiary statement. Yet, in the few instances in which Mr. Nelson disputed a fact statement offered by defendant, Mr. Nelson offered no evidence to support the denial (*see* Pl.'s Resp. to Def.'s Local Rule 56.1(a) Statement of Material Facts ("Pl.'s Fact No.") 31-33, 45). Thus, under Local Rule 56.1(b)(3)(c), we deem those fact statements admitted.[2] Mr. Nelson does not squarely dispute

---

[2]We have also reviewed the factual material offered by defendant in support of those fact statements, and find that it supports the statements asserted by defendant.

any of the other 54 statements of fact offered by defendant. Rather, as to certain of the facts, Mr. Nelson seeks to qualify or recast the facts, or to quarrel about the relevance or weight they should be given. Legal argument should be presented in a brief, and not in a response to a Local Rule 56.1 statement. *See Guzzo v. Northeast Illinois R.R. Corp.*, 1996 WL 131730, at *1 (N.D. Ill. Mar. 15, 1996). Those responses by Mr. Nelson do not raise a genuine dispute as to the facts offered by defendant, and so we deem all of them to be admitted as well (although we consider Mr. Nelson's arguments about relevance and weight when we consider the effect of the undisputed facts under the governing legal principles).

That said, what we set forth below are the undisputed facts underlying the motion for summary judgment.

## II.

### A.    Background.

Mr. Nelson is a Black male, who began his employment with the defendant in February 1999 (Def.'s Fact St. 1). He has had three years of college education (*Id.* at 52). After initially working on a part-time basis, Mr. Nelson assumed the duties of a full-time letter carrier at the Roberto Clemente Postal Station, a position which he held as of January 2002 (*Id.* at 2-3). The primary duty of a letter carrier is, not surprisingly, to deliver the mail: out of an eight-hour workday, a letter carrier on average delivers mail for about six hours each day (*Id.* at 4-5).

At all relevant times, the station manager at Roberto Clemente Postal Station was Rey Rueda, an Hispanic male (*Id.* at 6). Three supervisors reported to Mr. Reuda: Samuel Nieves, an Hispanic male; Fred Taylor, a Black male; and April Maloy, a Black female (*Id.*). John Richardson, a Black

male, was the manager of human resources for the Chicago District of the United States Postal Service  (*Id.* at 7).

## B.    Mr. Nelson's Transfer Request.

In January 2000, plaintiff claimed that he began experiencing difficulty in delivering the mail because, after walking only three blocks, his legs would swell and his knees would begin to hurt, requiring him to take 15-minute breaks (Def.'s Fact St. 8).  On February 5, 2000, Mr. Nelson requested that, "due to medical reasons," defendant transfer him to the position of a distribution window clerk, because that position required less walking than Mr. Nelson's job as a letter carrier (*Id.* at 10-11).  Mr. Nelson did not ask for any kind of accommodation in his position as a letter carrier that would allow him to continue to perform that job (Def.'s Reply, Ex. 1, at 81-82).

Mr. Nelson's February 5, 2000 request did not identify the medical condition that led him to ask for a transfer.  However, in his deposition, Mr. Nelson stated that his leg swelling and knee pain were the result of hypertension and kidney disease, and that these conditions prevented him from carrying and delivering a full route as a mail carrier (Def.'s Fact St. 9).  Mr. Nelson later provided letters to support his request for a transfer from Dr. Sheldon Hirsch, an nephrologist who treated Mr. Nelson for his hypertension and kidney disease.  Those letters, dated March and June 2000, stated that Mr. Nelson was under the care of Dr. Hirsch for severe hypertension and kidney disease, which caused leg swelling and knee pain.  Dr. Hirsch suggested that as a result, Mr. Nelson be given a position that "does not require him to walk for long distances or extended lengths of time" (*Id.* at 12).

Before writing those letters, Dr. Hirsch did not independently verify that Mr. Nelson's medical conditions impaired his ability to walk; rather, he relied on Mr. Nelson's own description

5

of his symptoms (Def.'s Fact St. 13). During his deposition, Dr. Hirsch acknowledged that knee pain is not a common side effect of hypertension and kidney disease; that during his consultations with Mr. Nelson between February and June 2000, Dr. Hirsch observed no swelling of Mr. Nelson's legs; and that Dr. Hirsch found no objective evidence of any limitations on Mr. Nelson's ability to walk long distances (*Id.* at 14). Moreover, Dr. Hirsch testified that he prescribed medication to Mr. Nelson that, if taken, would control any leg swelling that Mr. Nelson experienced, and that if Mr. Nelson took the medication as prescribed, it would be unusual for leg swelling to persist (*Id.* at 15-16). However, Dr. Hirsch observed that Mr. Nelson was "severely" noncompliant in taking his medications and missing appointments, and that this noncompliance was a "big problem" for Mr. Nelson's ability to cope with his conditions (*Id.* at 16).

## C. Defendant's Response to Mr. Nelson's Transfer Request.

At all relevant times, defendant operated under a collective bargaining agreement with the National Association of Letter Carriers. Pursuant to that collective bargaining agreement, postal service jobs were segregated into separate crafts, with each craft constituting an independent bargaining unit (Def.'s Fact St. 17). Plaintiff's request to transfer into the position of a distribution window clerk involved a request to transfer between different crafts (*Id.* at 18). Whenever a request is made for a transfer into a different craft, the person requesting the transfer is evaluated by the appropriate station managers for conduct, attendance, safety record and any applicable medical restrictions (*Id.* at 20).

In response to Mr. Nelson's request for a transfer to the distribution window clerk position, Mr. Richardson – the manager of human resources – scheduled Mr. Nelson for a medical examination and assessment (Def.'s Fact St. 22). The report of that assessment, dated April 10,

6

2000, concluded that Mr. Nelson was "medically qualified to perform the essential functions of the distribution window clerk position *(Id.* at 23; Ex. 10).

In connection with the transfer request, Ms. Maloy – Mr. Nelson's direct supervisor – prepared a written evaluation of Mr. Nelson's job performance, which she provided to Mr. Richardson in January 2001 (Def.'s Fact St. 24). In that evaluation, Ms. Maloy noted that Mr. Nelson had received a warning letter for delayed delivery of mail, and a one-day suspension for failure to maintain a regular work schedule. Ms. Maloy reported that Mr. Nelson had experienced three on-the-job vehicle accidents during the one-year period between October 1999 and October 2000. Ms. Maloy did not rate Mr. Nelson as excellent or above average in any of the 14 categories of job performance on the evaluation form. She rated Mr. Nelson as satisfactory on 8; she gave him no rating on one category, which was not applicable; and she rated him as unsatisfactory in 5 areas: work performance, productivity, attitude to supervisors, punctuality and customer relations (Def.'s Fact St. 25; Ex. 11 at 5). Ms. Maloy also stated that Mr. Nelson required precise instructions and constant oversight in order to make sure that he performed his work correctly *(Id.).* The evaluation attached Mr. Nelson's attendance record, which show that during the year 2000, he was AWOL for almost four months *(Id.* at 27). Mr. Rueda signed off on the review prepared by Ms. Maloy *(Id.* at 24).[3]

Upon receiving the medical records and transfer evaluation materials, Mr. Richardson submitted Mr. Nelson's request for change of craft to seven plant managers at five different facilities

---

[3]Mr. Nelson claims that this evaluation is not accurate, and that he believes Mr. Rueda (who is Hispanic) lied on the evaluation to discriminate against him (Def.'s Fact St. 28). However, Mr. Rueda only signed off the evaluation prepared by Ms. Maloy, Mr. Nelson's direct supervisor, who is Black and whom Mr. Nelson acknowledges was not being discriminatory when she completed the evaluation *(Id.* at 29).

during the time period from February to December 2001 (Def.'s Fact St. 31). Although Mr. Nelson

had sought transfer only to the window clerk position, Mr. Richardson sought out a broader range

of positions for Mr. Nelson, including distribution clerk; distribution/window clerk; mail handler;

mail processor; flat sorter machine operator; and small parcel bundle sorter (*Id.* at 32). All of these

positions are in different crafts than the position of letter carrier (*Id.* at 33). Each of these requests

for transfer was denied by the plant managers at the relevant facilities. In four instances, the requests

were denied because of the negative evaluations that Mr. Nelson received from Ms. Maloy; in two

instances, they were denied because there were no vacancies; and in one instance, the request was

denied because there were no jobs that plaintiff could perform within his stated physical limitations

(*Id.* at 35). By a letter dated February 25, 2002, Mr. Richardson informed Mr. Nelson that his

request for a change of craft was denied (*Id.* at 38; Ex. 14).[4]

## D.    Mr. Nelson's Ultimate Separation from the Postal Service.

On March 12, 2002, Mr. Richardson sent a letter to Mr. Nelson stating that because of his

medical inability to perform the work as letter carrier, he had 14 days to select one of three options

in lieu of termination: seeking a disability retirement; seeking regular retirement; or resigning

(Def.'s Fact. St. 40; Ex. 15). On March 13, 2002, Mr. Nelson contacted the EEO officer regarding

his denial of his transfer requests (*Id.* at 42). Thereafter, on March 15, 2002, plaintiff's supervisor,

Mr. Taylor (who is Black), sent Mr. Nelson a notice of proposed separation (*Id.* at 43; Ex. 16).

Mr. Rueda (who is Hispanic) approved the request (*Id.*). Like the March 12 letter, this notice

indicated an intent to terminate Mr. Nelson unless he exercised a retirement or resignation option.

---

[4] Mr. Nelson had suffered an on-the-job accident on September 9, 2001, in which he suffered a fractured ankle.
This kept him out of work until February 2002 (Def.'s Fact St. 36).

However, this notice indicated that no action would be taken to terminate plaintiff for 30 days. Defendant has offered no explanation as to why both the March 12 and March 15, 2002 letters were sent to Mr. Nelson, as they appear to be largely duplicative – except for the time given to Mr. Nelson to exercise an option to avoid termination.

Mr. Nelson signed the notice of proposed separation on March 18, 2002 (Def.'s Fact St.; Ex. 16, at 2). Thereafter, Mr. Rueda received a call from an individual he believed to be Mr. Nelson, threatening to kill Mr. Rueda (Def.'s Fact St. 44-46). As a result, Mr. Nelson was placed on emergency off-duty status effective March 20, 2002 (*Id.* at 47). Mr. Nelson filed a grievance regarding the decision to place him on emergency off-duty status; that decision was upheld (*Id.* at 47). Thereafter, on July 26, 2002, defendant issued to Mr. Nelson a letter of decision informing Mr. Nelson that he would be terminated as of August 13, 2002. (*Id.* at 49; Ex. 20). The termination was based on Mr. Nelson's inability to perform his work as a letter carrier, and the inability to obtain another position within the postal service (*Id.*).

### III.

We consider first Mr. Nelson's claim for disability discrimination. In that claim, Mr. Nelson asserts that the defendant unlawfully failed to accommodate his alleged disability in two ways: (1) by failing to adjust his duties so that he could continue to perform the work of a letter carrier; and (2) by failing to grant him a transfer into a different position. The standards for assessing Mr. Nelson's disability claim are the same under the ADA and the Rehabilitation Act. *Washington v. Indiana High School Athletic Ass'n*, 181 F.3d 840, 845 n.6 (7th Cir. 1999) (cases decided under the ADA and the Rehabilitation Act are precedent for each other). To avoid summary judgment on his disability discrimination claim, Mr. Nelson must point to evidence that creates a triable issue on each

of the following elements of a prima facie case: (1) that he is "disabled," as defined by the Rehabilitation Act; (2) that he was otherwise qualified to perform his job; (3) that the defendant failed to reasonably accommodate his disability; and (4) that he suffered an adverse employment decision because of his disability. *Dvorak v. Mostardi Platt Associates, Inc.*, 289 F.3d 479, 43 (7th Cir. 2002). Mr. Nelson has failed to offer evidence to create a triable issue on several of these elements.

**A.**

At the threshold, Mr. Nelson has failed to offer evidence that he suffered from a disability as defined in the Rehabilitation Act. There is no dispute that Mr. Nelson suffered from hypertension and kidney disease. However, the presence of medical conditions does not, alone, satisfy the statutory definition of disability. Rather, a person is disabled under the Rehabilitation Act if that person (1) has a physical or mental impairment which substantially limits one or more of his major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. 29 U.S.C. § 706(20)(B); *see also Roth v. Lutheran General Hospital*, 57 F.3d 1446, 1454 (7th Cir. 1995). In this case, there is no evidence that Mr. Nelson had a record of impairment, or that the postal service regarded him as having an impairment (apart from responding, as it was required to do, to Mr. Nelson's claim that he needed a transfer because Mr. Nelson regarded himself as having an impairment). Thus, we focus on the evidence concerning whether Mr. Nelson's physical conditions substantially limit one or more of his major life activities. For the following reasons, we find that Mr. Nelson has failed to offer evidence that creates a triable issue on this point.

*First*, there is no evidence from which a jury reasonably could conclude that Mr. Nelson's impairment substantially limits one or more of his major life activities. According to Dr. Hirsch, the

10

leg swelling and knee pain that Mr. Nelson claimed to suffer only limited his ability to "walk for long distances or extended lengths of time" (Def.'s Fact St.; Ex. 7).[5] In the April 2000 medical examination and assessment that resulted from Mr. Nelson's request to transfer, Mr. Nelson acknowledged that he was able to exercise regularly (involving upper body weightlifting using 225 pounds four days each week) (*Id.*; Ex. 10). In addition, the medical assessment resulting from that examination was that Mr. Nelson was able to perform the work of the distribution clerk position that he sought (*Id.*).

On this record, a jury could not reasonably conclude that Mr. Nelson's physical impairments substantially limited a major life activity. Major life activities are those activities of central importance to an individual's daily life, such as "walking, seeing, hearing, and . . . 'performing manual tasks.'" *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002) *quoting* 45 C.F.R. § 84.3(j)(2)(ii). "[A] person is 'substantially limited' if, compared to the average person in the general population, she cannot perform or is limited in the manner in or extent to which she can perform one of the recognized activities." *Dvorak v. Mostardi Platt Associates*, 289 F.3d 479, 483 (7th Cir. 2002). A person claiming a substantial limitation in the major activity of working must demonstrate not simply an inability to perform the particular job that he or she presently maintains, but a significantly restricted ability to perform a broad range of jobs. *Equal Employment*

[5]We accept for purposes of the motion the proposition that Mr. Nelson's knee pain and leg swelling were the result of the kidney disease and hypertension that he unquestionably had. In so doing, we have given Mr. Nelson a large benefit of the doubt. Dr. Hirsch testified that when he wrote the notes indicating that the hypertension and kidney disease "caused his leg swelling and knee pain" (Def.'s Fact St., Ex. 7), he was relying on Mr. Nelson's description of his symptoms. Dr. Hirsch had not done anything to independently verify the accuracy of Mr. Nelson's description. Indeed, when Dr. Hirsch treated Mr. Nelson between February and June 2000, he found no objective evidence of any limits on Mr. Nelson's ability to walk long distances and no evidence of leg swelling. Dr. Hirsch also testified that knee pain is not a common side effect or result of kidney disease and hypertension (Def.'s Fact St. 14).

*Opportunity Comm'n v. Schneider Nat'l, Inc.*, No. 06-3108, Slip Op. at 7 (7th Cir. Mar. 21, 2007); *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 953 (7th Cir. 2000).

Under these standards, Mr. Nelson has failed to create a triable issue as to the question of whether he was substantially limited in a major life activity. There is no evidence that he is significantly restricted in his ability to perform manual tasks, see, or hear. Assuming that working is a major life activity, a matter that is open to question, *see Equal Employment Opportunity Comm'n v. Schneider Nat'l, Inc.*, No. 06-3108, Slip Op. at 7 (7th Cir. Mar. 21, 2007), there is no evidence that Mr. Nelson is substantially limited in his ability to work, beyond the particular position of a letter carrier. To the contrary, the evidence is that there were other positions within the Postal Service that he could perform, and the evidence is that Mr. Nelson has the educational background (three years of college) that would suggest his employability in a variety of positions outside the Postal Service. Mr. Nelson has not offered any evidence – as he was obliged to do – to show a substantial limitation in his ability to perform a broad range or class of jobs. *See Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1168 (1st Cir. 2002) (a plaintiff who claims that a disability substantially impaired the major life activity of working will typically be required to offer evidence concerning the relevant job market, such as "evidence concerning the accessible geographic area, the numbers and types of jobs in the area foreclosed due to the impairment, and the types of training, skills, and abilities required by the jobs").

To the extent that Mr. Nelson claims that walking is the major life activity in which he is substantially limited, his claim of disability fares no better. Mr. Nelson has offered no evidence that the limitation on his ability to walk for long distances or extended lengths of time places him outside the ability of the average person in the general population. There is no shortage of case law holding

12

that persons with limitations on walking equal to or greater than that of Mr. Nelson were not disabled. *See, e.g., Kelly v. Drexel University*, 94 F.3d 102, 106 (3rd Cir. 1996) (plaintiff with a hip injury was not substantially limited in walking when he could not walk more than a mile, could not jog and could only climb stairs slowly with the help of a rail); *Bochenek v. Walgreen Co.*, 18 F.Supp. 2d 965, 970 (N.D. Ind. 1998) (plaintiff who, after a knee replacement surgery, experienced numbness with prolonged sitting, and inability to walk a few blocks without resting, and occasional pain was not substantially limited in walking); *Barker v. Andrew Corp.*, 1997 WL 803866, *1-4 (N.D. Ill. Dec. 31, 1997) (plaintiff was not substantially limited in walking when he could not take long walks and was in significant pain when he walked).

*Second*, even if Mr. Nelson's leg swelling and knee pain caused him to be substantially limited in walking or working, that limitation would not qualify as a disability if it could be corrected by mitigating measures. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83 (1999); *see also Murphy v. United Parcel Service, Inc.*, 527 U.S. 516 (1999) (holding that plaintiff who suffered from high blood pressure was not disabled, because his condition could be inherently controlled with medication). In this case, Dr. Hirsch testified that any leg swelling that Mr. Nelson might experience as a result of the kidney disease could be controlled through medication, which Dr. Hirsch prescribed. Dr. Hirsch testified that it would be "unusual" if a patient who took the prescribed medication as required experienced any chronic problem with swelling in the legs (Def.'s Fact St.; Ex. 6 at 23). The problem, according to Dr. Hirsch, was that Mr. Nelson was severely non-compliant with his medication regime, and that this non-compliance created a "big problem in terms of his prognosis" (*Id.* at 23, 30). Nor can Mr. Hirsch claim that his non-compliance itself was the result of his disability. We have been offered no evidence that there is something inherent in the conditions

13

of kidney disease or hypertension that would interfere with the ability of a patient to take medication as required. On these facts, Mr. Nelson has failed to create a triable issue on the question of whether he is a "disabled person."

**B.**

Even had Mr. Nelson been able to create a triable issue on the question of disability, his claim would fail to survive summary judgment. One of Mr. Nelson's theories is that he could have performed his letter carrier job, with reasonable accommodation that defendant failed to provide. In order for Mr. Nelson to create a triable issue on this point, he would have to offer evidence that he could perform the essential functions of his letter carrier position, with or without reasonable accommodation. *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2000). However, according to Mr. Nelson, he could not walk more than three blocks without taking a 15 minute break. (Def.'s Fact. St. at 8). This limitation obviously would disqualify Mr. Nelson from performing the essential function of a letter carrier: that is, to deliver mail to residences and office buildings, which a letter carrier on average does six hours each day (*Id.* at 5).

Moreover, while Mr. Nelson now claims that defendant failed to accommodate him by adjusting the letter carrier position so that he could perform it, he did not request such an accommodation at that time. Rather, what Mr. Nelson sought as an accommodation was a transfer to entirely different position (and craft) – a window clerk position. Even now, in the summary judgment briefing, Mr. Nelson does not suggest what accommodation would have enabled him to perform the essential functions of the letter carrier position with an impairment that precluded him from walking more than three blocks without taking a 15-minute break. We recognize that an employee who seeks an accommodation does not have the sole responsibility for telling the employer

14

how the accommodation should be done; the interactive process involving accommodation requests requires that a employer and employee address that matter together. *Equal Employment Opportunity Comm'n v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005). But, Mr. Nelson cannot expect that the postal service would know that he wanted to remain in the letter carrier position, with accommodation, when the only request he made at the time was to be transferred to an entirely different position.

Nor do we find a triable issue in Mr. Nelson's theory that the postal service failed to reasonably accommodate him by denying his transfer request. To be sure, a reasonable accommodation at times may involve assignment to a different job position. *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 677-78 (7th Cir. 1998). However, the duty to reasonably accommodate does not require an employer to bump an incumbent from a position in order to create an opening, *Giles v. United Airlines,* 95 F.3d 492, 499 (7th Cir. 1996), or to violate a collective bargaining agreement or its legitimate transfer and hiring policies. *Dalton,* 141 F.3d at 678-79.

Here, the undisputed evidence is that Mr. Richardson cast a broad net for a possible transfer assignment for Mr. Nelson – indeed, broader than Mr. Nelson himself sought. The requests were made over the period of nearly one year, and resulted in an inability to find a new position for Mr. Nelson. In several instances, the managers at the facilities in question reported that there were no openings available, or none that Mr. Nelson could perform given his stated limitations. Mr. Nelson has offered no evidence to contradict his sworn testimony, as it was his obligation to do. *Jackson v. City of Chicago*, 414 F.3d 806, 813, (7th Cir. 2005) (plaintiff must establish that vacant positions exist for which the plaintiff is qualified). Mr. Nelson offers only incredulity at the proposition that there were no openings available for him (*see* Pl.'s Fact Resp. 35, 38). But, his incredulity does not

15

adequately substitute for evidence on summary judgment. *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001) (plaintiff's conclusory statement that several positions existed that could accommodate his disability failed, where the plaintiff provided no evidence comparing these qualifications to job requirements or evidence that positions were vacant).

Several of the managers declined to accept Mr. Nelson as a transfer employee because of his checkered employment and attendance history. The record on summary judgment revealed that Mr. Nelson's direct supervisor, Ms. Maloy, expressed substantial criticism of his job performance and attendance. While Mr. Nelson disagrees with Ms. Maloy's assessment, he does not attribute to her any discriminatory motive for that assessment (Def.'s Fact St. 29), or offer any evidence to show that she did not honestly believe that assessment. Thus, on this factual record, defendant had a legitimate, nondiscriminatory reason for not transferring Mr. Nelson to certain other job locations where there may have been openings based on his subpar job performance record; there is no evidence that this legitimate nondiscriminatory reason was a pretext for discriminatory action. *See Kralman v. Illinois Department of Veterans' Affairs*, 23 F.3d 150, 156 (7th Cir. 1994) (a showing of pretext does not inquire into the correctness of an employment decision, but rather whether the employer honestly believed the reason given for the decision).

Contrary to Mr. Nelson's suggestion in his summary judgment papers, the ADA and the Rehabilitation Act do not render irrelevant an allegedly disabled employee's job performance and attendance history. The ADEA "is not a mandatory preference act." *Equal Employment Opportunity Comm'n v. Humiston-Keeling, Inc.*, 227 F.3d 1024, 1028 (7th Cir. 2000). So long as the managers at the other locations rejected Mr. Nelson's transfer requests because of his job performance and attendance, and not his alleged disability, they acted on safe ground. *See Craig v. Potter*, 2003 WL

21349469, at *8 (N.D. Ind. May 12, 2003) (a plaintiff raising a claim of disability discrimination failed where plaintiff was denied the postmaster position at other mail facilities because, in part, plaintiff did not contend that he was the "best person for the job, with or without a disability").

Accordingly, the plaintiff's failure to offer evidence showing a failure of reasonable accommodation provides further grounds for granting the defendant's summary judgment motion.

### IV.

As best as we can determine from Mr. Nelson's summary judgment papers, his race discrimination claim is based on the proposition that in denying him transfer to a different craft position, defendant treated him less favorably than an Hispanic letter carrier, Ms. Venegas, who was allowed to change crafts (Def.'s Fact St. 55 and Pl.'s Fact Resp. 51-53). Thus, Mr. Nelson seeks to prove race discrimination using the indirect method of proof, which requires him to make a *prima facie* showing that: (1) he was a member of a protected class; (2) he was performing his job satisfactorily; (3) the employer took an adverse employment action against him; and (4) the employer treated at least one similarly situated individual outside of his protected class more favorably. *Rhodes v. Illinois Department of Transportation*, 359 F.3d 498, 504 (7th Cir. 2004). If Mr. Nelson "were to clear this hurdle," then the defendant "would have to articulate a nondiscriminatory reason for firing him, and in response [plaintiff] would have to put forth competent evidence that the proffered nondiscriminatory reason was a pretext for unlawful discrimination." *Little v. Illinois Department of Revenue*, 369 F.3d 1007, 1011 (7th Cir. 2004).

Here, plaintiff has failed to offer evidence to clear the *prima facie* case hurdle, because he has not offered sufficient evidence from which a jury reasonably could conclude that Ms. Venegas's situation was similarly situated to his own. "A similarly situated employee is one who is directly

17

comparable to [the plaintiff] in all material respects," *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (citation omitted), "without mitigating circumstances that explain the difference in their treatment." *Williams v. General Mills*, 926 F.Supp. 1367, 1377-78 (N.D. Ill. 1996). In this case, the summary judgment record fails to provide evidence that Ms. Venegas was similarly situated to Mr. Nelson. Ms. Venegas received a transfer from the letter carrier position because, while on duty, she witnessed a person being stabbed, who then fell on her and bloodied Ms. Venegas's uniform. This caused her to be mentally traumatized, and led the postal service to give her a change in craft (Def.'s Fact St. 57).

Mr. Nelson offers no evidence to indicate that in making that transfer, defendant gave Ms. Venegas consideration that was denied to Mr. Nelson. For example, there is no evidence that Ms. Venegas was allowed to bump an existing employee out of a position to create a vacancy, when Mr. Nelson was not allowed to do so. Moreover, plaintiff has offered no evidence concerning Ms. Venegas's employment history, and certainly nothing to indicate that she had a record of employment performance and attendance that was as poor as that of Mr. Nelson. Thus, there is no evidence from which a jury reasonably could find that postal services managers denied Mr. Nelson a transfer based on his poor performance record, but allowed Ms. Venegas to transfer despite a similarly poor record. Nor has Mr. Nelson offered evidence as to who made the decision to grant Ms. Venegas a change of craft; we have no evidence that the decision makers who granted Ms. Venegas's transfer request were the same ones who denied Mr. Nelson's transfer request. On this record, we cannot conclude that Mr. Nelson and Ms. Venegas were similarly situated. Accordingly, we grant defendant summary judgment on Mr. Nelson's race discrimination claim.

**V.**

Finally, we address to Mr. Nelson's retaliation claim. Mr. Nelson claims that he received a notice of proposed separation on March 15, 2002, in retaliation for contacting the EEO on March 13, 2002 to complain about failing to receive a transfer into a different craft position (Def.'s Fact St. at 58). We analyze the retaliation claim under the indirect method of proof, because Mr. Nelson has pointed to no direct evidence of retaliation: that is, evidence which "if believed, . . . would prove the fact in question without reliance on inference or presumption," which "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (*quoting Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). In order to establish a *prima facie* case of retaliation under the indirect method, Mr. Nelson must show that he engaged in statutorily protected expression; that he performed his job according to the employer's legitimate expectation; that he suffered a materially adverse employment action; and that he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Brewer v. Bd. of Trustees of the Univ. of Illinois*, No. 06-1259, Slip. Op. at 28 (7th Cir. Mar. 21, 2007); *Mannie*, 394 F.3d at 984.

Mr. Nelson plainly engaged in statutorily protected expression by filing an EEO complaint, and ultimately suffered a materially adverse action: he was terminated. However, setting aside Mr. Nelson's job performance shortcomings, a central problem with his retaliation claim under the indirect method of proof is that Mr. Nelson has offered no evidence that he was treated less favorably than other similarly situated employees who did not engage in statutorily protected activity. In opposing summary judgment, "it is the plaintiff's duty to identify a similarly situated employee who

19

was better treated. *Brewer*, Slip. Op. at 29. Mr. Nelson failed to do so here, and for that reason alone, the retaliation claim fails.

Moreover, we note that the March 15, 2002 notice of proposed separation (Def.'s Fact St.; Ex. 16) is not materially different from the March 12, 2002 letter (*Id.*, at Ex. 15), which Mr. Nelson indisputably received before he contacted the EEO. The March 15 notice of proposed separation indicated that because he had not been able to obtain a change in craft, Mr. Nelson's only options to avoid termination were to apply for disability requirement, to apply for regular retirement, or to resign (Def.'s Fact St.; Ex. 16). Likewise, the March 12, 2002 letter gave Mr. Nelson those same three options to avoid termination, and indicated that if he did not elect one of those options, action would be taken to "separate you from the Postal Service" (*Id.*; Ex. 15). Indeed, the March 12 letter (which preceded Mr. Nelson's contact) gave him only 14 days, or until March 26, to exercise one of those options in order to avoid termination. By contrast, the March 15 letter, which came after the EEO contacts, gave him 30 days, or until April 14, to decide whether to elect one of the three available options in order to avoid termination.

As a result, the retaliation claim fails for two additional reasons. *First*, the March 15 letter only repeated a decision that had been made prior to any EEO contact. By contacting the EEO, Mr. Nelson did not obtain immunity from an employment decision that already had been made. *Limes-Miller v. City of Chicago*, 773 F.Supp. 1130, 1147 (N.D. Ill. 1991) (an employer's continued action on a decision made before the protected activity occurred breaks the causal link between the protected expression and alleged retaliatory action). *Second*, the alleged retaliatory action in the March 15 letter actually extended to Mr. Nelson a benefit that he was not given in the March 12

20

letter: additional time to decide whether to retire or resign in lieu of being terminated. It is hard to find retaliation in an action that gave Mr. Nelson a benefit that he was not previously extended.

Accordingly, for the foregoing reasons, we grant defendant summary judgment on Mr. Nelson's retaliation claim.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (doc. # 66) is granted. This case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated:  April 2, 2007**

21